## HUNT, PARTRIDGE & CO.

### v.

## ADEN D. ELDRIDGE ET AL.

1. SALE—WHEN TITLE VESTS.—When the sale of goods on time is absolute and the parties intend the title to pass on delivery, it becomes vested in the vendee, whether the purchase money is paid or not; but when the vendor is to retain the title until the purchase money is paid, the title, as between the parties, does not pass until the condition is performed.

2. VERDICT AGAINST EVIDENCE.—The questions in this case are mainly of fact, and the court is of opinion that the verdict is against the evidence.

APPEAL from the Circuit Court of Morgan county; the Hon. CYRUS EPLER, Judge, presiding. Opinion filed January 13, 1880.

Mr. WILLIAM H. BARNES, Mr. GEO. W. SMITH and Mr. CHARLES A. BARNES, for appellants; that if the defendant would raise the issue that he was himself a member of plaintiff's firm, he should do so by proper pleas, and failing in that, he is now estopped from raising the question, cited 1 Chitty's Pl. 435; Shufeldt v. Seymour, 21 Ill. 523; Gordon v. Bankhard, 37 Ill. 147; 1 Phillips on Ev. 372.

If no one was defrauded, there can be no fraud: 3 Parsons on Contracts, 771.

Messrs. EPLER & CALLON and Mr. J. H. KELLOGG, for appellees.

HIGBEE, J.   This was a suit in replevin, for a stock of goods,

commenced by appellants against appellees on the 8th day of July, 1878.

The declaration contained counts in the *cepit* and *detinet.* Pleas *non cepit, non detinet,* and property in Aden D. Eldridge.

On the trial below the jury found the property in the goods to be in the defendant Aden D. Eldridge. A motion for a new trial was overruled, and judgment rendered against appellants for costs, from which they prosecute an appeal to this court, and assign for error the various rulings of the court below.

It is insisted by appellants that the verdict was so clearly against the weight of the evidence, that the court below should have set it aside and granted a new trial. It appears from the evidence that prior to the 19th day of May, 1877, appellee Aden D. Eldridge had been the owner of a stock of goods at Logansport, Indiana, and was keeping a ninety-nine cent store. He was indebted to Horace Partridge and Co., of Boston, for goods in the sum of $3,298.50, and was by them and other creditors put into bankruptcy, and his stock of goods placed in the hands of an assignee. The goods were appraised and offered for sale, and on the said 19th day of May, 1877, sold by the assignee to appellants for $2,201.50, being two-thirds of their real value. Appellants paid the purchase money in cash, and took possession of the goods by their agent, Charles Kinsman, rented a store, received the key to the same, and turned over the stock to Aden D. Eldridge to be sold. It also appears from an account offered in evidence by appellees, that the firm of Horace Partridge & Co. was composed of Horace Partridge, Benjamin F. Hunt, and Frank P. Partridge; and that, for the purpose of keeping the business of this store in Logansport separate from their business in Boston, they carried it on in the firm name of Hunt, Partridge & Co., and opened a book in which Horace Partridge & Co. charge Hunt, Partridge & Co. with $5,500 for the stock of goods, being the amount of Eldridge's indebtedness to them, and the amount paid to the assignee in bankruptcy.

Eldridge claims that this purchase was made for him, and that he thereby became the owner of the goods. He continued

business at Logansport until the latter part of July, 1877, when, at the request of appellants, he moved the stock to Jacksonville, Illinois, where he continued business until the goods in controversy were replevied.

It is apparent, from the letters in evidence, that the goods were bought of the assignee in bankruptcy at a bargain, and that large profits were expected from their sale.

The business, both before and after the removal, was at all times conducted in the name of Hunt, Partridge & Co. The advertisements, bank account, renting storehouse at Jacksonville, and all purchases, sales and shipments of goods were in their name.

At the time of the purchase Eldridge was in bankruptcy, and largely indebted to appellants, and, according to Eldridge's theory, they bought the goods for him, and turned them over to be sold by him, without security, or so much as a note or other evidence of indebtedness, and without any agreement for interest on the money advanced, or any share in the profits to be derived from the sale of the goods.

At the time of the purchase, appellants agreed to furnish other goods as required from time to time, and did, prior to the commencement of this suit, furnish goods to the amount of $4,296.55; and in the meantime received remittances from Eldridge to the amount of $5,155, as appears by the account above referred to.

Eldridge, in his evidence, claims that he is entitled to additional credits for remittances of $800 and $382, making, in all, $1,182.

Even if these credits were allowed, he would still owe a balance, without paying anything on the original indebtedness before bankruptcy. As soon as the purchase was reported to appellants, they commenced and thereafter kept up a correspondence with Eldridge, in which they assumed the direction and management of the business, and this was acquiesced in by Eldridge in his correspondence. Such conduct would seem to be wholly inconsistent with his ownership. Six days after the purchase, they sent him a contract to be signed, in which they employed him, at a salary, to act as their clerk. And this con-

tract Eldridge says he wrote for, and, although it appears not to have been signed, it was prepared according to his understanding at the time, but he now says it was all intended as a blind to keep off the creditors.

In January, 1878, the traveling agent of appellants visited Jacksonville and took an account of stock in this store and it amounted to $3,000. In July following he visited the store again, and found that Eldridge had started two other stores, one at Alton and the other at Pekin, both in his own name; and the stock at Jacksonville in the name of Hunt, Partridge & Co. was reduced to $590.

It also appears from the evidence that Eldridge had purchased some small bills of goods from other parties, and added to the stock from time to time; but they were bought in the name of appellants, and so far as paid for, it is reasonable to suppose that they were paid for out of the proceeds of sales, and they undoubtedly belonged to the owners of the other goods. In a letter of May 24th, 1877, appellants say to Eldridge: "This stock, of course, is now in our name, and you must look well to it that it does not run down instead of up. * * * * * If you cannot afford to look after it, we can afford to look after it ourselves, because we do not want to lose any more money, if we can help it." In their letter of July 13th, 1877, they say: "We hope you will be able to clear up all by Christmas time, and be working on your own account. Do not buy a thing outside, for we need all the trade, and money, too, that it is possible to get."

Many other facts, not changing the general features of these transactions, are in proof; we think, after examining all the proofs in the case, the finding of the jury is so clearly against the evidence that it should be set aside and a new trial granted.

We also think, in view of the evidence in this case, that the court erred in giving appellees' third and tenth instructions. They informed the jury that if there was a sale of the goods to Eldridge, then the title passed to him, whether the purchase money was paid or not. When the sale of goods on time is absolute and the parties intend the title to pass on delivery, this is the law; but when the vendor is to retain the title until the

purchase money is paid, the title (as between the parties) does not pass until the condition is performed. Story on Sales, section 313.

Eldridge, in his testimony, says: "The understanding was that I should run in the name of Hunt, Partridge & Co., until I got my discharge in bankruptcy. I then expected to change my name, only I was to pay this $2,201.50 back," and on cross-examination he says: "The goods were mine when they were paid for," and his brother, who was a witness introduced by him, says that he was present at the purchase, and that his brother was to take the stock of goods and pay the purchase money, and run it in his own name. If the title was not to vest in Eldridge, until the goods were paid for, and this was a question for the jury, the instructions were clearly wrong.

For these reasons, the judgment below is reversed, and the cause remanded.

Reversed.